278 N.J. Super. 412 (1995)
651 A.2d 472
GENERAL ACCIDENT INSURANCE CO. OF AMERICA, PLAINTIFF-RESPONDENT,
v.
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION AND JOHN DOE INSURANCE COMPANIES 1 THROUGH 20, DEFENDANTS. N.B. FAIRCLOUGH & SON, INC., DEFENDANT-APPELLANT,
v.
HARTFORD INSURANCE COMPANY; INTERSTATE FIRE INSURANCE COMPANY AND CHICAGO INSURANCE COMPANY; MISSION INSURANCE COMPANY; NATIONAL GRANGE MUTUAL INSURANCE COMPANY; NATIONAL UNION INSURANCE COMPANY; NORTHBROOK INSURANCE COMPANY; RELIANCE INSURANCE COMPANY; AND SELECTIVE INSURANCE COMPANY, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 6, 1994.
Decided January 5, 1995.
*413 Before Judges PRESSLER, CONLEY and NEWMAN.
James P. Fox argued the cause for appellant (Morris, Downing & Sherred, attorneys; Mr. Fox on the brief).
Michael H. Cohen argued the cause for respondent (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Mr. Cohen of counsel and on the brief, Michael A. Dolich, Heidi P. Rubin Cohen on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
In February 1974 an act of vandalism caused a spill of approximately 1,300 gallons of No. 2 fuel oil from a tank truck located on the premises of defendant N.B. Fairclough and Son (N.B.) where it operated a fuel storage business. Plaintiff General Accident Insurance Company (General Accident) provided commercial general liability and automobile insurance policies to N.B. for the period of December 31, 1972 to December 31, 1975. As a result of the oil leak, contamination of the ground water and private wells occurred and the Department of Environmental Protection and Energy commenced remediation and cleanup procedures against N.B. and issued two directives, December 31, 1985 and April 8, 1987, and an Administrative Order on February 18, 1988 pursuant to N.J.S.A. 58:10-23.11f. In response thereto, General Accident, as the insurer of N.B., hired an environmental counselor as well as an engineering firm and over the years has expended in excess of $100,000 in compliance with the DEPE directives and order. It is undisputed that the bulk of these expenditures has been for remedial investigation engineering costs. No remediation plan is *414 yet in place. The 1988 DEPE directive ordered N.B. to prepare a Remedial Investigative/Feasibility Study (RI/FS). Apparently, that has not been completed.
In 1987, General Accident filed a declaratory judgment action contending that under the provisions of the commercial general liability insurance policies issued to N.B., it had no obligation to defend or indemnify N.B. against the directives and order of DEPE.[1] After various pleadings were filed, General Accident and N.B. entered into a consent order in 1990 which provides in pertinent part that:
1. General Accident will provide indemnity coverage to Fairclough in an amount not to exceed the aggregate sum of $100,000 for claims other than bodily injury claims related to the site.
2. General Accident shall continue to provide Fairclough with a defense of all DEP claims arising out of certain DEP "directive letters" pertaining to the site.
3. Upon exhaustion of the sum of $100,000 through indemnity payments, as differentiated from defense expenses, General Accident's obligation to provide a defense shall terminate, provided however that both parties reserve the right to move before this Court for a determination of the propriety of any payment of any portion of the indemnity limits to a third party.
In 1994, pursuant to this consent order, General Accident filed a motion to enforce litigant's rights, contending that the over $100,000 it had already expended on engineering costs in response to DEPE's remediation investigation requirements constituted indemnity or liability coverage and was not cost of defense. Its obligation then to defend N.B. any further in connection with DEPE's cleanup directives and order had ceased.
In granting the motion and declaring that General Accident was relieved of any further responsibility to provide a defense and/or indemnity payments to N.B. under its insurance policies, the trial judge said:
Okay. I'm going to grant the motion. I think these costs are in the nature of damages. And basically, it seems to me that the  this is a whole new area. So the *415 concept that's involved in these environmental cleanup cases is different than the ordinary tort case. And so looking precisely at the language of the policy sometimes leads you down the wrong alley. And I think here the damage is done and there is damage, public damage, at the time of the spill. And from that point on, the DEP undertakes to have the  whoever is the one who's done the dumping or owns the property, to clean it up. And part of that cleanup is a requirement that a study be done by an engineer that has to be a qualified engineer. And the engineer is required to follow the methodologies as set forth by the DEP, which is fairly specific, if I read these documents correctly as to what has to be done. And the idea there is that that is part of the costs of cleanup that has to be borne by the  by the defendant, the polluter, because it's not a situation where the DEP pays for an investigator to investigate the property and then decides what cleanup has to be done. DEP says you have to do it. And you then give us the report. And we all go from there. There is a certain amount of negotiation; but, essentially, the investigation is directed at determining what needs to be done and getting it done.
Thus, the trial judge agreed with General Accident's contention that the costs incurred in complying with obligations imposed by DEPE constitute "legal obligations paid on behalf of the policy-holder `as damages' regardless of whether additional remedial action is required by the agency."
In this respect, General Accident points out, correctly so, that the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11, makes no material distinction between the obligation to undertake remedial investigations and the ultimate obligation to contain or remove pollutants. There is, moreover, no question that required cleanup and removal costs imposed under the Act pursuant to N.J.S.A. 58:10-23.11g(c)(1) include the type of engineering costs at issue here. N.J.S.A. 58:10-23.11b(d). See Woodland Private Study Group v. State of New Jersey, 616 F. Supp. 794, 800 (D.N.J. 1985), judgment vacated as moot, 846 F.2d 921 (3rd Cir.1988) ("[c]leanup and removal expenses are broadly defined [in the Act], so as to include the costs of preparing an RI/FS. N.J.S.A. 58:10-23.11b(d)"). And see N.J.A.C. 7:26C-1.3 (remedial investigations are "actions to investigate and or mitigate any known contamination and the problems presented by a discharge ... [it] includes sampling and monitoring, as necessary, and includes the gathering of sufficient information to determine the necessity for remedial action....").
*416 At the heart of General Accident's position is its characterization of these engineering costs as "legally mandated damages" and thus indemnity payments. See Morton International, Inc. v. General Accident Insurance Company of America, 134 N.J. 1, 27, 629 A.2d 831 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994). To be sure, the Act imposes "joint and several liability, nearly absolute liability, the virtual elimination of substantive defenses, mandatory treble damages, and no preenforcement hearing." Matter of Kimber Petroleum Corp., 110 N.J. 69, 79, 539 A.2d 1181 (1988), appeal dismissed, 488 U.S. 935, 109 S.Ct. 358, 102 L.Ed.2d 349 (1988). When a spill of hazardous waste occurs, DEPE may take one of three alternative actions: 1) it can act to remove the waste and then bring a cost-recovery action against the responsible party, N.J.S.A. 58:10-23.11g; 2) it can direct a responsible party to remove the waste, N.J.S.A. 58:10-23.11g(c) and (d); or 3) it can seek removal costs from the responsible party while maintaining control itself over remedial actions. Kimber, 110 N.J. at 73, 539 A.2d 1181. See N.J.A.C. 7:26C-2.5(g).
It is the second option that has been pursued in this case. Although pursuant to N.J.S.A. 58:10-23.11a, a responsible entity faces treble damages if it does not comply with DEPE directives, it may nonetheless choose to challenge a directive and may avoid the treble damage penalty "[i]f the court determines that a company's basis for non-compliance is objectively reasonable, even if the court does not ultimately uphold the company's argument, DEP's request for treble damages may be rejected if not reasonable in light of all the circumstances." Kimber, 110 N.J. at 84, 539 A.2d 1181. See N.J.A.C. 7:26C-2.5(h).
General Accident, then, on behalf of N.B., had the choice of resisting the DEPE directives. Obviously deeming it more expedient to comply and, in doing so, maintain some control over and input into the remediation requirements, see N.J.A.C. 7:26C-5.5, it chose to incur the investigation costs involved here.
*417 This brings us to the pertinent provisions of the insurance policies:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
Coverage C bodily injury or
Coverage D property damage
to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance, or use, including loading and unloading of any automobile, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payments of judgments or settlements.
[emphasis provided].
The critical language that must be focused upon is the provision that the insurer "may make such investigation and settlement of claim or suit as it deems expedient...." General Accident concedes that the engineering costs here are costs of investigation. Certainly DEPE's directives are premised upon a claim that N.B. is a responsible party under the Act. And regardless of whether the remedial investigations fall within the traditional notion of "settlement", they plainly serve to delineate and mitigate N.B.'s potential ultimate liability, albeit in response to DEPE directives. Moreover, since the remediation investigations will lead to a plan that, presumably, will remove and mitigate the potential liability under the Act, they are as well incurred in an effort to settle or resolve the claim. Cf. Fireman's Fund Ins. Companies v. Ex-Cell-O Corp., 790 F. Supp. 1318, 1321 (E.D.Mich. 1992) ("[d]efense costs include not only those reasonable and necessary to defeat or limit liability but also those costs, including consulting fees, that are reasonable and necessary to limit the scope and/or costs of remediation, even if similar or identical studies have been ordered by the government....")
Morton International, Inc. v. General Accident Insurance Company, supra, is not to the contrary. We acknowledge that "environmental response costs and remediation expenses" imposed *418 under the Spill Act have been held to constitute "damages" within the meaning of indemnity provisions of commercial liability policies in both Morton and various other cases. But the focus has been upon the insurers' contention that administratively imposed cleanup costs constitute "equitable relief" and not "damages" for insurance coverage purposes. See Morton, supra, 134 N.J. at 22-23, 629 A.2d 831. The position that General Accident now takes here, i.e. that those cleanup costs attributable to remedial investigations are not costs of defense within the meaning of the policy provisions we have aforecited, was simply not before the court in Morton or any other reported cases cited by plaintiff. We will not extend Morton to an issue that was not before it.
It may be that this analysis does not tightly mesh with what one may normally consider as investigation and settlement of a claim as part of a duty to defend a lawsuit. Cf. Firemen's Fund Ins. Companies v. Ex-Cell-O Corp., supra, 790 F. Supp. at 1333. But the policy language refers to investigation and settlement of claims, not just law suits. It may also be that resort to notions of reasonable expectations of the insured, e.g. Franklin Mut. Ins. Co. v. Security Indem. Ins. Co., 275 N.J. Super. 335, 341, 646 A.2d 443 (App.Div. 1994); Search EDP Inc. v. American Home Assurance Company, 267 N.J. Super. 537, 541, 632 A.2d 286 (App.Div. 1993), certif. denied, 135 N.J. 466, 640 A.2d 848 (1994), are not applicable. And we recognize that courts should not "engage in a strained construction to support the imposition of liability," or "write for the insured a better policy of insurance than the one purchased." Longobardi v. Chubb Ins. Co. of New Jersey, 121 N.J. 530, 537, 582 A.2d 1257 (1990). We view, however, the plain language of the policy to encompass the remedial investigation costs here involved and we need not, therefore, resort to either of these seemingly contradictory propositions. Cf. Nunn v. Franklin Mutual Insurance Co., 274 N.J. Super. 543, 644 A.2d 1111 (App.Div. 1994); Weitz v. Allstate Ins. Co., 273 N.J.Super 548, 551-52, 642 A.2d 1040 (App.Div. 1994). At the least, the policy language is ambiguous and thus should be resolved in favor of the insured. *419 E.g., Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 177-78, 607 A.2d 1255 (1992).
Reversed and remanded for the entry of an order vacating the declaratory judgment and dismissing of General Accident's motion to enforce litigant's rights.
NOTES
[1] Other insurance companies were drawn into the litigation through a John Doe designation and subsequent third-party complaint. The claims against these other insurance companies have been dismissed, with the exception of National Grange Mutual Insurance Company.